John D. Cole and Eileen M. Cole, et al. * v. Commissioner. Cole v. Commissioner
Docket Nos. 86783, 86785, 86786.
United States Tax Court
T.C. Memo 1962-287; 1962 Tax Ct. Memo LEXIS 20; 21 T.C.M. (CCH) 1522; T.C.M. (RIA) 62287; December 3, 1962
*20 Held, that certain bad debt losses incurred by a partnership of which the present petitioners were the members, were nonbusiness bad debts within the meaning of section 166(d) of the 1954 Code, which are not deductible in computing the amounts of the partnership's net incomes. Held, further, that the partners on their individual returns may not deduct as bad debts any part of said partnership losses, and that they may have the benefit of the same only as short-term capital losses, in accordance with section 702(a)(1) of the 1954 Code. Paul J. Buckley, Esq., 701 Third Nat'l Bldg., 32 N. Main St., Dayton, Ohio, for the petitioners. Donald P. Krainess, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the income taxes of the several petitioners, as follows: Taxable
Docket
calendar
No.
Petitioner
year
Deficiency
86783
John D. Cole and
1955
$10,860.91
Eileen M. Cole
1956
14,284.93
86785
Harold F. Layer and
1955
7,399.39
Helen Layer
1956
9,668.73
86786
Melvin J. Trumble
1955
6,577.98
and Josephine K.
Trumble
1956
8,550.76
The cases were consolidated for trial. The issue for decision is whether certain bad debt losses which were sustained *21 by a partnership operated by the petitioners, constitute business bad debts that are fully deductible under section 166(a) of the 1954 Code; or whether the same constitute nonbusiness bad debts that are to be treated as short-term capital losses under section 166(d) of said Code. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. The petitioners in each of the three dockets here involved are husband and wife. Cole and his wife, and Trumble and his wife resided in Dayton, Ohio, and they filed joint Federal income tax returns for the years here involved with the district director of internal revenue at Cincinnati. Layer and his wife, on the other hand, resided in Chesterland, Ohio; and for each of said taxable years they filed a joint Federal income tax return with the district director at Cleveland. The term "petitioners," as used herein, will have reference to the husband-petitioners. Since 1938 and continuing throughout the taxable years involved, the several husband-petitioners carried on, as partners, a highly specialized business of making ad valorem appraisals of real *22 properties for local tax purposes, under contracts with cities, counties and other public authorities. The partnership was conducted under the name of "Cole-Layer-Trumble Company" (hereinafter called "C-L-T Company"). It had its principal place of business in Dayton, Ohio; but during the taxable years, it operated in about 24 states. From January 1, 1946, and continuing through the taxable years, the extent of petitioners' partnership interests were: Cole, 51 percent; Layer, 27 percent; and Trumble, 22 percent. They shared partnership profits and losses in the same ratios as their partnership interests. During the year 1954, while C-L-T Company was engaged in appraising properties in Toledo, Ohio, petitioners learned that Willys Motors, Inc., was then operating a separate division which was devoted to projects in the electronics field - principally performing Government contracts for components of missiles and airplanes. In addition, this Willys electronics division had developed a new type of television camera, utilizing a vidicon tube, and it had produced a working model of such a camera. Petitioners learned that Willys was desirous of disposing of the buildings, equipment, and other *23 assets of its said electronics division, and that the asking price was $250,000. They did not have sufficient funds to make such a large purchase; but they further ascertained that the patents, drawings, testing equipment, assembly stands and spare parts relating to the television camera could be purchased for $12,000. Also, during conferences had with certain key employees of the electronics division, petitioners became aware that these key employees would be willing to sever their connection with Willys, and go to work for a new corporation to be formed for the purposes of completing development of the television camera, and of manufacturing and marketing the same. Thereafter, on October 28, 1954, a new corporation known as Fleetwood Corporation was formed under the laws of Ohio for the stated purposes of designing, manufacturing, producing, buying, selling, distributing, and generally dealing in radio, television and all types of electrical equipment. Fleetwood's authorized capital stock consisted of 400 shares of no-par-value common. Petitioners and the electronics division key personnel believed that $32,000 would be sufficient capital for the corporation. C-L-T Company (the partnership) *24 subscribed for and purchased 110 shares of such stock at $200 per share, or $22,000; and John McGee (formerly chief project engineer for the Willys' electronics division) subscribed for 50 shares at $200 per share, or $10,000. Petitioners, together with McGee, were elected the directors of Fleetwood. McGee was elected president; petitioner Layer, treasurer; and petitioner Cole, chairman of the board of directors and secretary of the corporation. Fleetwood thereupon purchased from Willys the assets relating to the abovementioned television camera, for the price of $12,000; and it began operations on or about November 1, 1954, in rented quarters in Toledo. McGee never paid for the shares of Fleetwood stock to which he had subscribed; and in January 1955, when he resigned as an officer and director of Fleetwood, his stock subscription was canceled. To make up for the capital which McGee had failed to provide, C-L-T Company purchased an additional 15 shares of Fleetwood stock for $3,000 in February 1955; and at about the same time, certain individuals who had left Willys' electronics division to work for Fleetwood, also purchased shares. The total amount of capital paid into Fleetwood *25 for stock was $31,000 or $32,000. Following McGee's resignation as president, petitioner Cole was elected to that office. Fleetwood's operations during 1955 were not successful. Defects were discovered in the television camera that required further experimentation before the camera could be marketed. Thereupon the corporation embarked upon a "crash" program to develop a second project - which was a television projector that would be capable of projecting a large picture upon a screen, either from direct video reception or from television circuit. The development of this new projector and the further improvement of the above-mentioned television camera, together with subsequent selling and servicing efforts, required more funds than had been anticipated when Fleetwood was organized. In addition, after sales of cameras and projectors actually began (apparently in the late spring or early summer of 1955), the accounts receivable were slow in being collected; for further defects in the products became apparent after installations of the equipment, and the purchasers refused to make payments until satisfactory performance could be assured. By mid-December 1955, the corporation's credit *26 was in grave jeopardy. There were sizeable amounts owing to the Federal Government for income taxes withheld, to the State of Ohio for premiums on workmen's compensation insurance, and to other creditors who were demanding payment for materials and services furnished. Thus at said time, the officers, directors and shareholders of Fleetwood realized that the corporation was virtually faced with receivership. And about 6 weeks later, on February 2, 1956, these fears were realized when one of Fleetwood's creditors filed a petition in the local court for the appointment of a receiver. Fleetwood did not oppose such appointment; and accordingly on the same date, a receiver was appointed. During the events of the year 1955 just described, Fleetwood obtained funds in addition to those which had been paid in for its stock from two sources. The first of these sources was C-L-T Company; and the following table shows the dates and the amounts of the advances made by that partnership: Date
(all dates
are in 1955)
Amount
Feb. 14
$ 7,500.00
Apr. 23
5,000.00
Aug. 16
6,000.00
Oct. 8
2,000.00
Oct. 29
1,000.00
Nov. 14
1,000.00
Nov. 25
1,000.00
Dec. 12
8,500.00
Dec. 21
1,021.93
Total * *27 $33,021.93 Each of the foregoing advances was evidenced by a 90-day 5 percent promissory note executed by Fleetwood to the order of C-L-T Company. No collateral was given to secure any of such notes. The second of the above-mentioned sources from which Fleetwood obtained funds in 1955 (in addition to those which it had received from the sales of its stock) was from borrowings made by it from the Ohio Citizens Trust Company of Toledo - all of which borrowings were guaranteed by C-L-T Company. Thus, on April 26, 1955, Fleetwood obtained from said bank a loan in the amount of $14,670, of which it repaid $1,300 in 1955; and on three other unspecified dates in 1955 it made three additional loans aggregating $20,000. Subsequently in 1956, after Fleetwood had been placed in receivership, repayment of the balance due on Fleetwood's above-mentioned bank loans, in the amount of $33,370 principal plus $632.27 interest (or a total of $34,002.27), was made by C-L-T Company to the Ohio Citizens bank, pursuant to the partnership's guarantee of Fleetwood's notes. *28 As heretofore found, the receiver for Fleetwood was appointed on February 2, 1956. Subsequently during said year 1956, C-L-T Company (the partnership) filed claims with the receiver for the following: (1) $33,021.93 representing the aggregate amount of the above-mentioned advances which it had made to Fleetwood in 1955; and (2) $34,002.27 representing the abovementioned amount which it paid to the Ohio Citizens bank pursuant to its guarantee obligations. No amounts were paid by the receiver on either of these claims during the taxable years here involved; but subsequently in 1957 (a year not before us), the receiver did pay a total of $2,932.75 in respect of said claims. The C-L-T Company, in its partnership return of income for the year 1955, claimed a business bad debt deduction for the aggregate advances of $33,021.93 made in that year; and in its 1956 partnership return of income, it claimed a business bad debt deduction for said amount of $34,002.27 which it had paid to the bank as guarantor of Fleetwood's notes. The respondent however, in his notice of deficiency for the years 1955 and 1956, disallowed these claimed business bad debt deductions; and he classified the same as *29 nonbusiness bad debts which, under section 166(d) of the 1954 Code, are treated as short-term capital losses. The results of these adjustments were: (1) That the amount of the partnership's net income for each of the taxable years, and also the amounts of the partner's distributive shares thereof, were increased; and (2) that the benefits of the short-term capital losses (resulting from the classification of the losses as nonbusiness bad debts) were made available to the partners individually, under section 702(a)(1) of the 1954 Code. The C-L-T Company, in addition to the above-mentioned losses which it sustained in respect of the Fleetwood Corporation, also sustained a loss in 1956 with respect to advances made to another corporation named Dayton Film Supply Company, which operated a retail camera store in Dayton. In 1950, C-L-T Company had bought one-third of the capital stock of this Dayton Company, at a price of $1,000. From time to time thereafter, C-L-T Company made loans to the corporation aggregating $14,000; and in 1956, there remained an unpaid balance due on these loans of $8,966.92. In this same year, the Dayton Company redeemed C-L-T Company's stock in the corporation *30 for $1,000; and at the same time, it settled its unpaid indebtedness to the partnership for $5,500 - thereby causing the partnership to sustain a loss of $3,466.92 in respect of the advances which it had made. The C-L-T Company, on its partnership return of income for the year 1956, claimed a business bad debt deduction of said amount of $3,466.92. The respondent however, in his notice of deficiency for the year 1956, disallowed such business bad debt deduction, and treated the loss as being a nonbusiness bad debt. The effects of this adjustment were similar to those which resulted in respect of the partnership's transactions with the Fleetwood Corporation. Ultimate Findings of Fact The C-L-T Company partnership was at all times here material engaged in a business of appraising real estate; and it was not, either during or prior to the taxable years involved, engaged in a business of financing other business enterprises. The advances which C-L-T Company made to or on behalf of the Fleetwood Corporation, and to the Dayton Film Supply Company, were not proximately related to the operation of its own business; and the losses which it sustained in respect of said advances were not incurred *31 in the operation of its own business. Opinion The crucial question in this case is whether the losses which C-L-T Company (a partnership) sustained during the taxable years involved, should be treated as business bad debts, or as nonbusiness bad debts, within the meaning of section 166 of the 1954 Code. [1] We think that all these losses must be classified as nonbusiness bad debts. Section 166(a) of the 1954 Code provides that, "There shall be allowed as a deduction any debt which becomes worthless within the taxable year". However, section 166(d) excludes from the application of *32 section 166(a), any "nonbusiness debt" - which term is defined by negative implication to be a debt other than (1) a debt created or acquired in connection with a taxpayer's trade or business; or (2) a debt, the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Consequently, if the bad debt losses here involved are to escape classification as nonbusiness bad debts, the petitioners must establish that the debts out of which said losses arose, had a proximate relationship to the partnership's own business, either at the times when such debts were created or at the times when the same became worthless. We are convinced from our examination of all the evidence in the present case, that the several debts here involved had no proximate relationship to the business which the partnership itself carried on. The sole business of the C-L-T partnership was, as we have heretofore found as a fact, that of appraising real estate for cities, counties and other public bodies; and, neither during the taxable years involved or at any time prior thereto, was it even engaged in a business of financing business enterprises. Although it did make investments in shares of *33 stock and also made advances of cash to or on behalf of the Fleetwood Corporation and the Dayton Company, these were merely casual transactions which bore no relationship whatever to the partnership's appraisal business. And the petitioners, on brief, have candidly conceded that the partnership was not a promoter of business enterprises, by making the following statement: [Petitioners] do not now nor have they at any time taken the position that the C-L-T Company was in the business of organizing, promoting, financing, or dealing in business ventures. * * * Based on the foregoing, we hold that the debts which arose out of the advances made by C-L-T Company to the Fleetwood Corporation and to the Dayton Company were nonbusiness debts; and that the losses which were incurred in respect thereto were nonbusiness bad debts within the meaning of section 166(d) of the 1954 Code. We further hold that when C-L-T Company fulfilled its guarantee obligation to the Ohio Citizens bank in respect of Fleetwood's notes, a further debt owing to the partnership from Fleetwood was created ( ); and that the loss sustained in connection with this debt likewise was a nonbusiness *34 bad debt. Therefore, we approve the treatment which the Commissioner accorded to these nonbusiness bad debts in his notices of deficiency - the details of which treatment have been set forth in our Findings of Fact. All of this accords with the treatment which we approved for use under similar circumstances, in the recent cases of , and , pending on appeal to C.A. 3. There is no merit to the petitioners' position that, even though the losses here involved do not qualify as business bad debts of their partnership, such losses may nevertheless be deducted as business bad debts by the petitioners individually. In the case of , we held that a taxpayer may not take as a bad debt deduction on his individual tax return, a proportionate part of a bad debt due to a partnership of which he was a member. We adhere to said principle; and we hold that the nonbusiness bad debts of the partnership are available to the partners individually, only as short-term capital losses, in accordance with section 702(a)(1) of the 1954 Code. The issue here involved is decided in favor of the respondent. Decisions *35 will be entered for the respondent. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Harold F. Layer and Helen Layer, Docket No. 86785; and Melvin J. Trumble and Josephine K. Trumble, Docket No. 86786.↩
*. There was an additional advance of $4,000, which was repaid to C-L-T Company by Fleetwood. Neither the date of such advance, nor the date of repayment, is shown by the record herein.
1. The respondent, both in his deficiency notices and on brief, presented an alternative contention, that all the advances which C-L-T Company made to the Fleetwood Corporation in 1955 were in reality contributions of additional equity capital, and not loans. We think it unnecessary, however, to consider this alternative contention. The petitioners' position is that all the advances were debts; and the respondent's position in the alternative is to the same effect. A decision as to whether the losses sustained in respect of such claimed debts were business bad debts or nonbusiness bad debts will be dispositive.↩